Case No. 24-13-18, Beyond Nuclear Inc. and Sierra Club Petitioners v. U.S. Nuclear Regulatory Commission in the United States of America. Ms. Curran, for the petitioners, Mr. Aberdech, for the respondents, Mr. Rahn, for the Nuclear Energy Institute. Good morning. Good morning. My name is Diane Curran. I represent Beyond Nuclear and the Sierra Club. This National Environmental Policy Act case raises the purely legal issue of whether the NRC may, as a matter of law, refuse to evaluate two types of environmental impacts of reactor license renewal that it has conceded are reasonably foreseeable. First, the climate change effects on accident risk during the initial license renewal term, which would be between 40 and 60 years of operation, because the initial operating license term is 40 years. And then there's the second possible license renewal term that goes from 60 to 80 years. The climate change issue applies to both. The second issue is whether there are unique characteristics of aging reactor equipment that appear only in the second license renewal term that are different than everything else that's happened so far that ought to be considered in EIS. I'd like to begin by explaining why this case is different from a recent Supreme Court case that is on everyone's mind, seven counties. And there are three reasons. One is this case did not involve indirect downstream impacts that are under the control of a different agency. Everything here emanates from the operation of nuclear reactors that is within the complete control of the NRC. If the effects are indirect, it is because they're in the future. That's one understanding of indirect impacts. The minute the reactor starts operating in a license renewal term, of course, the risk starts, but the consequences of an accident would not happen necessarily until sometime in the future. The second aspect is this case involves a purely legal error. The only rationale the NRC gave for refusing to consider these impacts was that they were out of scope. Safety issues covered by the Atomic Energy Act. There is no exception in NEPA for carve out for another statute review. NEPA requires consideration of radiological impacts because they affect the human environment. So this is a purely legal error. And it's important to note that the NRC made that single defense in the license renewal GAIS in responding to comments, but completely dropped it in their brief, understanding, we believe, that this was legal error. Finally, seven counties is different in the sense that that case involved what the court called a comprehensive evaluation of the environmental impacts at issue there. In this case, we have none whatsoever. No analysis. And even if the NRC could point to we have an Atomic Energy Act-based analysis, it doesn't exist with respect to climate change. Can I go back to the basic framing that you started with, which was these two things are environmental impacts. Yes. And I think the NRC would say that's not right. The environmental impact here is the harm that occurs if a severe accident were to come to pass. And aging and worsening, I think of it as storms from climate change, are two inputs into that risk. And when you look at the record, we actually studied that risk, the risk of severe accidents, quite extensively. Now, you might still have other arguments, but do you agree with that basic framing? These are inputs into a category of environmental impact. They're not impacts in their own right. Judge Garcia, two things about that. One is that the NRC claims, of course, this is in the response to comments and in the brief. It's not in the environmental analysis that we were given to comment on in the draft. They say the severe accident analysis is conservative enough to embrace these issues. But with respect to climate change, in the brief, the NRC said we don't understand climate change well enough to do it. So we ask ourselves, which is it? Did you do it or did you not? We do not believe they did anything. This is a post hoc rationalization for not looking. The agency put its head in the sand. We cannot see anywhere where this was analyzed. With respect to the aging issues, what we have is a guidance document, no regulation, a guidance document that in the introduction says this is voluntary and we're looking to the licensees to resolve this issue. This is not NEPA compliance. If the agency is going to do that, they need to talk about it. What are the implications, the environmental implications of this decision-making process? Can I just add one follow-up on the climate point? So I think what they say, it might be fair to characterize this and say we're not going to figure out how much worse this is going to get. But what they do say is something like we analyze this risk and what we have is a margin of error, before we would call this category of impact significant, of something like 100 times. And it's fast-moving. It's difficult to study how much worse the hurricanes are going to get over the next 40 years. But we're pretty darn sure it's not 100 times. And so this is their reliance on the margin. So could you just specifically address that? Because if it were that there's just, there's 100 uncertain causes out there, but no one has given us a reason to think they're going to be significant in relation to the scale of this margin that we have, that does seem more reasonable. So I want to hear your answer to that. Yes. Three things. First of all, the NRC's analysis of weather impacts so far throughout its history has been historical, the historical record. The NRC has never tried to, they use the word project, but they have never tried to anticipate how climate change might change these weather effects. You know, we're in, it's an odd thing, but we're in the middle of one of these today. Hurricane Melissa. So they have never looked at that. And, okay, second, they have at page F12 of their GEIS, which is page JA354, they say we're going to make a plan, we're working on a draft plan, and we're going to look at these impacts for individual reactors and we're going to look at mitigation measures. If that's what they're doing, then why aren't they doing it in a draft EIS? They're saying we think there's something here that ought to be looked at. You know, they're not saying they want to do it under NEPA. They're saying we're going to do it outside over there at some time. We're not going to tell you when, and it's not going to have a bearing on our license issues. And then, finally, NEPA requires, and this is held by this court in State of New York versus NRC 681 F3D 471, that when the NRC does an environmental impact analysis of accident risk, it has to separate out probability from consequences. Those are both important issues with respect to these impacts because, you know, what we know about climate change is the likelihood of these events is going up, and we also know that the consequences of these events are going up. And the NRC uses the word as to – they use the word additive, which is really another word for cumulative. Weather events add to the accident risk that we have. These factors need to be put in and demonstrated how they affect the probability and the consequences. To make a blanket statement, all this fits in our severe accident analysis, that's undermined by this plan that they supposedly have, and it's also undermined by their statement in their brief, we don't think these weather effects are easy enough to analyze that we could do it. So, you know, we think that one of the purposes, and this is a holding of seven counties that we rely on, NEPA is a procedural statute. NEPA requires the NRC, if they're going to make a licensing decision that affects the human environment, put it in a draft EIS, what you think the effects are on the human environment, and give us the probability and give us the consequences, give us your technical data, because we have members of the public, we have state and local governments, we have independent technical experts who want to review your work and determine do we think that you've done a good job. This is not reasoned decision making. This case not just violates NEPA, but it violates the Administrative Procedure Act. The record does not conform with your...  Have you brought that thing here? Yes. So what I'm having difficulty with, and I guess this is following on Judge Garcia's initial question, is the relevant government action here, which NEPA is applying, is the licensing of a nuclear reactor to operate. And put aside that the generic EIS doesn't do that by itself, they still have to have a plant-specific one. So your argument isn't that the license causes environmental harm. Your argument isn't that operation of the nuclear plant itself is causing these harms. Your argument is if there's a nuclear plant operating, and if a very big storm comes, then there's a risk that there'll be an accident, and a risk that that accident won't be contained by the existing safety mechanisms already built into that plant. And so then there's a risk that there'll be environmental harm from that accident. Am I understanding your argument right? Yes. It was just one thing that you said that I wasn't certain about. It all stems from the operation of the reactor. If the reactor isn't operating, you don't get the environmental effects. The action here, I mean, the New York case you referenced involved direct consequence of operation for a certain one, right? How are we going to deal with, I think it was spent nuclear rods, right? This thing's operating, we're creating waste, and we've got to do something with that waste. One hundred percent, that's just part of the process. It's not just operating, but cleaning up after yourself, right? That's not what you have here. What you have is licensing, operation, and then operation itself doesn't create the risk. What you want to say is you have two things, aging equipment or put aging equipment aside for this question. So just climate change.  Climate change creates a risk. Can I just... Climate change creates a risk that this operation will, if systems fail, result in environmental harm. It feels like this is an odd vehicle for this argument, as a NEPA argument. We see this as climate change as a cumulative or, as the NRC would say, additive effect on accident risk. And, you know, you have to back up for a minute. With an effect on accident risk. Yes. It increased the risk. And there's no doubt that accident risk is an environmental impact of a nuclear plant. That's well established. So the question is, what about... No, it's a risk of an environmental impact. The mere fact of a risk is not itself an environmental impact. It creates a risk of an environmental impact. That's why I say this is different than the New York case. No, I would respectfully disagree, Judge Millett, because in that case, for instance... Because climate change now, as you just pointed out, and yet we haven't had any nuclear accidents. One of the risks, for example, was pool fires, spent fuel storage pools catching on fire. That's an environment, the risk was seen by this court as an environmental impact. You're going to have those pools there. The pools themselves are dangerous. Right. You can have seepage risks and things like that. But here, your argument is that there's a risk that a storm will come. Right. You're not licensing the storms. There's a risk a storm will come. And then there's a risk that storm will be of XY magnitude. And then there's a risk that if it's of XY magnitude, all of the existing safety protocols will not prevent harm that will then leak outside the operation of the nuclear plant itself and damage the environment. Am I understanding it right? Yes. And I just want to explain that the NRC traditionally looks at what... This is called an external event. So when they do accident analyses, they look at internal events, which is what you're talking about. You know, the piece of equipment breaks down. And then external events are weather, earthquake risk. They look at a lot of other... They look at weather. And they, you know, they consider that to be a relevant factor. Okay. And here, weather is now today understood to have different characteristics than it was understood when NRC first started looking at these things. It's still the weather. They look at past weather events. Do you know what the time range was for those past weather events? The worst event in historical recorded history. That's what they look at. And then they assume that... Sorry. Let me try the question again. Because my understanding is that the plants themselves as well are supposed to look at historical events. And they looked at historical weather events. What is the time range of that? If I submit a license or a renewed license application today, what time period am I looking at for my relevant past weather events? I believe it's the time period for which weather events have been recorded. And so that's going to include up to about the time I file my license. Right. But bear in mind... There's climate change. Bear in mind, okay, the way the NRC's regulations work, and this is 10CFR 54.31B, I think. The applicant can apply for initial license renewal 20 years before coming to the end of a 40-year term. So that means they're predicting out 40 years. And New York versus NRC says they've got to look at that time period far out in the future. They can't just say we're going to talk about what happened yesterday. They've got to predict. And, for instance, when they go to the second license renewal term, they can make that application the day they start operating under the first license renewal term. So, again, 40 years out, they're predicting what will happen to the very end of that license renewal term. This was the NRC's choice. They decided they're going to get these licenses a lot of time ahead of time to apply. But that puts a burden on the NRC of predicting, and it's not speculation. Or if they say we don't know, then tell us on the environmental record so that the public and the state and local officials can see, wow, they don't know. But you said they said we can't sort of predict beyond this. They don't say anything like that in the EIS itself. They say nothing. The EIS itself just says this is out of scope. Case closed. Go away. That's our problem with this. We never got to comment on anything. And there was never at any time in history a climate change rule under the Atomic Energy Act where the NRC said here's how we're going to anticipate climate change and regulate it under the Atomic Energy Act. We didn't get that either. Didn't they also say that climate effects are inherently localized? There will be different climate effects.  Okay. Good. All right. So they didn't say nothing. You know, they're doing a generic EIS here. They said these things are inherently localized. Right. So and a generic EIS doesn't get you a license renewal. You still have to have a supplemental EIS at the individual plant, right? But under the license renewal, no, no. Under the license renewal. You don't have to have a supplemental EIS at the individual plant. They don't have to address everything that is the purpose of the license renewal, GEIS, is to exempt the licensee and the NRC from having to address certain impacts in the individual cases. No. For instance. Am I correct? I still have to do a supplemental EIS. Right. And if it turns out that this, that there's, when you look at the, you said, you told us, NRC, we got to look at this as a local, on a local, regional, let's just say plant specific basis. And it turns out this plant is sitting in what is now a common track for major category 4 or 5 hertz. Hypothesize that. Then why wouldn't that plant be under an obligation to address that? Because the generic judgment from the EIS would not govern its particular risk. It has, based on climate change, new and significant information that it has an obligation to address. And if it doesn't, then you could challenge that supplemental EIS, right? A couple of things in response to that. First of all, the NRC does concede that climate change has site specific effects. But the only way they look at that in the individual license renewal proceedings is the effect on local resources. They don't connect the dots between, like, the water levels going up in the lake, how's that going to affect my nuclear plant? They don't connect those dots. If a member of the public... My point is not to bless or not agency decisions involving individual plants. The question is, you said they said nothing. They actually said this is local and regional. And if there's going to be these plant-specific processes before any license issues, I get they sort of get to check some boxes on the form already from the generic EIS, but that doesn't make them immune from an obligation to come forward with or a challenge based on new and significant information particularized to that plant. And so if they're not properly processing a particular plant's supplemental EIS, and therefore its ultimate license decision, can't that be challenged there? Or are you saying, no, we can't challenge it there, we win here, or we'll never be allowed in the future to raise arguments about plant-specific climate change risks? The problem with it is that when a member of the public gets to the individual license renewal proceeding, the first thing that happens is that we're told that this finding in the license renewal GEIS, this Category 1 finding about the risk of an accident, is binding. And you will have to submit a waiver petition. So putting a huge burden on a member of the public is to do this. So it might be one thing if, for instance, yeah, the agency has to consider new and significant information, and you could come in with your hearing request and say, this is new and significant information, and you had to meet the ordinary standard for getting a hearing. But that's not the case. The NRC has insulated these findings from any kind of site-specific challenge by requiring waiver petitions, and none has been ever granted, although many have been attempted. It is a mechanism. Can that decision be challenged? Yes. Has it been challenged? It has in different ñ there was NRDC versus NRC involving the Limerick plant. But the point is that this creates a huge procedural barrier to the consideration of new and significant information that is not otherwise there. These Category 1 findings have a purpose, and that is to expedite license renewal. It's not ñ they're saying we're going to give you extra procedural hurdles to meet. And if the NRC thinks that this is appropriate with respect to accidents, they have not justified it on the record. There is no analysis on the record that would justify that Category 1 finding. This is the place. These findings are applicable to ñ there's probably 30 applications that are either pending or coming down the road. This is the place where the NRC is making this crucial finding and hasn't put anything on the record. And then to say, you know, we're going to kick this down the road to individual licensing proceedings where we're going to make the public comply with waiver requirements is, you know, the utmost in arbitrary agency decision-making and not in compliance with NEPA. I know I am way past my time. I wanted to address the issue of vacator, but maybe I'm out of time. I'll give you two sentences. Okay. This case meets the Allied Signal Standard for vacator. There's nothing on the record. There's no harm to the utilities because the NRC is subject to the timely renewal doctrine, 10 CFR 2.109B, and they routinely grant exemptions if the licensees don't apply within their timeframe. A recent case on that is San Luis Obispo Mothers for Peace versus NRC 100F41039. That was the Ninth Circuit, 2024. All right. Thank you very much, Council. May I please have the floor? Andrew Averbeck from the Nuclear Regulatory Commission on behalf of the Federal Respondents. I'd like to begin with two major principles. These points go to the context for petitioner's arguments and the standards of review that the court ought to apply in considering them. First, this case isn't about whether the NRC has ignored certain types of impacts because they're remote and speculative or present as some kind of worst-case scenario. It's about whether the agency has reasonably addressed one discrete issue in its generic environmental impact statement, specifically whether it has reasonably characterized the foreseeable impacts of the consequences of an accident in a nuclear power plant, and whether the 100-page analysis the agency has devoted to this issue is somehow incomplete or deficient because it includes that the two sub-issues that petitioners have raised do not fundamentally alter the conclusion that the risk of a severe accident is small. Second, and relatedly, it's important to look at this case through the lens of seven-county infrastructure. And that case means that the agency is entitled to deference not only with respect to its technical determinations, but also with respect to the judgment calls that the agency makes in performing its environmental analysis and in determining as part of the exercise of that discretion what types of information will meaningfully inform its decision-making process. I get that deference, so I don't think there's any dispute that you have to consider all relevant information. Certainly, Your Honor, yes. And when you're doing accident risk assessments, it has to be a reasonable accident risk assessment. We agree. How can an accident risk assessment be reasonable if it's not looking at the risk to come rather than the risk that was in the past? That's a fair question, and I'll respond by saying that there is an extensive analysis of external events, the very types of events that are associated with climate. Certainly, and we take the information that has accumulated, and this was part of your question to counsel, up through today, or at least up to the date of the publication of the generic EIS to determine what the potential risks are, and it is true. The problem is that, as was fairly pointed out, this is a really long-term license. So the license itself is about 20 years out, and then depending on when they do it before they even need to get to that renewal line, and I get it's a long and complicated process, so they start early, but it could be a 25, 30-year time period. Is it reasonable not to include, in addition to, here's our thorough analysis of past weather events and their risk? Our view of what the weather risk is for the time period of this license renewal, let's just say 30 years ahead. Yes, I think it is reasonable. It's reasonable to ignore the future. I don't think it's quite right to say that we're ignoring the future, and let me explain why. First of all, there is margin built into the analysis, such that we're not just saying, oh, here's everything that's happened to date. We don't have to go an iota further than what has happened up to today. Second of all, and this was the focus of a lot of the questions previously. You said it was out of scope. Climate change is out of scope. So when you were doing your margin analysis, you weren't thinking about, sure, we've looked at past hurricanes or tornadoes, but you weren't thinking about the intensity and frequency and growing force of them going forward. You said that's out of scope. The commission said it was out of scope. Let me be clear about this. This, too, was remarked upon earlier. Climate change has begun. So in that sense, the up-to-date information that we're reviewing today or at the time of publication of the generic EIS includes trends that have accumulated up to the date. So if this is how much increase in frequency there's been over the last 20 years and increase in severity over the next last 20 years, then we project a similar or exponential. You guys are the experts in that. That's not the type of thing we would be reviewing going forward. But instead, you just said we're stopping at the time of the license. We're stopping but acknowledging that our regulatory regime provides for margin above and beyond that which has already happened. And then let me raise – Where did the commission say that that margin in our judgment covers the risks of climate change on increasing severity and frequency of severe weather events where these nuclear plants are located? At page JA213, the commission references margin. Now, to be fair, it doesn't specifically say exactly what the court just suggested, which is this is the forward aspect of the margin that covers – That was on the aging issue too. You know what? You're right. That was – 213 was aging. 222 is the page corresponding to climate change. But the agency has stated throughout – Which language you're pointing me to? Where they say our – not that we got big margins, but these big margins we have made in our judgments, we have made a judgment are sufficient to protect against environmental risk from climate change. There's no statement to that effect, Your Honor. But – So then that's my question. How can that be – that began with it wouldn't be reasonable not to look forward. Because we know – two points I'd like to make. First, because we know that the environmental analysis has yielded a 12,000 percent decrease in the risk to – the risk of accidents since these calculations were first performed in 1996. The agency was reasonably comfortable in concluding that its ongoing oversight of these plants – and that's an important issue I want to get to – is sufficient to conclude that the risk associated with even changing climate change will be handled. That's the thing you just told me doesn't exist. I'm sorry? You told me that they didn't make that judgment that this margin – if they had said this margin – wow, that's a big margin. They definitely said that. But they didn't say – and that is in our judgment, having looked at this weather trend, sufficient to protect against – to mean that our safety protections will apply – will reduce appropriately the risk from climate change accidents for the next 30 years. Correct. But what the agency did say is that it has an ongoing regulatory process in place to ascertain the effects of climate change as they occur and to take appropriate action as part of its regulatory scheme to make sure that threats as they emerge are appropriately handled. So that's what's on 222. Right. We learn new stuff. And that's what I want to – Wait, so if I can just follow up on this. Is – I mean, there's other parts. It's just curious. The NRC had talked about, you know – and I think it's one of the appendices – talked about how there are other government agencies can predict the track of climate change. There's information out there which they did not factor into their margin analysis. So tell me two things. One is when they say on 222, if new information about changing environmental conditions becomes available, what new information beyond what expert government agencies already have gathered, are they waiting for? And two, when they have that, what does it mean that they will change our – I don't understand how this language intersects with the generic EIS. So they will increase safety regulations? How will it be any process for the public and courts to review what they do? And if you could just – I mean, if they're going to adopt the regulation, that can be challenged. Or I just don't understand how this paragraph here intersects with the generic EIS. The court is correct that the generic environmental impact statement alone is not the universe of environmental consideration. So to the extent that there's new information, new and significant information that emerges as part of the agency's ongoing oversight, and the agency certainly consults with sister agencies who have even additional expertise beyond that of the NRC, to the extent that new and significant information emerges, then yes, that would be an appropriate candidate for consideration directly as new and significant information or pursuant to the waiver process that counsel for petitioners has mentioned. You guys have never allowed a waiver. That's not correct. There have been waivers issues. I don't have them at my fingertips. But let me also point out that in New York, the NRC, too, we had exactly the same arguments that were made. And this court specifically recognized that the waiver process was an appropriate means of seeking an escape hatch of some form from what counsel refers to as the forever binding nature of the Category 1 determinations or in the generic environmental impact statement. We are trying to – Sorry. No, no. Is there a waiver process that would now allow sort of reopening of the generic EIS, or is this waiver only going to apply? Because I thought it went with the new and significant information, which would only be plan-specific. The waiver process is a means of getting admitted to a licensing proceeding as part of the adjudication before the NRC. Typically, the NRC would say, you can't challenge a rule in an NRC adjudicatory proceeding. And petitioners would come in and say, well, in this case, there are special circumstances indicating that the rule shouldn't be applied. And one of the reasons they can say it is that, well, the purpose of the rule isn't applicable here because, as the court suggested, we have new information suggesting that Category 5 hurricanes are likely to descend upon some particular area. And that would be fair game for such a challenge. But what if the new and significant information, you know, shows a risk for likely to be on one particular location? You know, it could be an entire region, or it could be the entire east coast of the United States, where there's multiple plans. Not all of which might have a license proceeding before the NRC at the relevant time.  So if they need more sort of cross-cutting change, you know, the risk is broader than a particular plan. Well, two avenues, your Honor. One is a petition for rulemaking. Ask the agency to redo its analysis in light of this information. For the generic EIS. Yes. Or two, the generic EIS itself specifically states that it is designed to be re-evaluated at 10-year increments so that we're not stuck in 2024 forever. Well, you might not be, but you will have already issued an awful lot of licenses that are going to govern for the next 30 years. And let's say five, seven years from now, oh, my gosh. This risk, the storms, I hope not. The storms are extraordinary. And a lot of these nuclear plants, surprise, surprise, are near water areas. And it's extraordinary. We've had a problem at one already with a terrible environmental impact. We've got to revisit this generic EIS. We've got to deal with this. We've got to change our regulations on safety. We've got to do a complete overall, kind of like your post Fukushima one, only imagine it were here in the U.S. And then what happens to all those licenses you've already issued? Well, that's an important point. And I want to make this clear. The dangers of a storm, of a hurricane, of a tornado, of an earthquake, those are things that the NRC monitors as part of its ongoing oversight of reactor operations, independent of the question of whether or not a license should be renewed. So let's just assume for a moment that the NRC issues a new license for a brand-new nuclear plant tomorrow. And we don't then put aside our safety review of the plant or our ongoing oversight of the plant for 40 years. Rather, on a day-to-day basis, the NRC is monitoring events related to natural hazards. And you can certainly rest assured that were this hurricane to have descended upon the United States, there would be eyebrows raised about, well, what's going to happen now to make sure that nothing happens as a consequence and what steps need to be taken. And the court recommends that. We have to wait until it hits the United States. I mean, this is not that far away. I get that. And perhaps that wasn't the best explanation. Certainly, when a credible threat of something happening emerges, the NRC's antennae go up and make sure that all reasonable precautions are required of the licensee in order to maintain or at least maintain adequate reasonable assurance of adequate protection. That's the NRC's mission. That's how the NRC in the main regulates nuclear power plants. It is true that this accident analysis is part of the analysis that it does in considering license renewal. But in the main, what the NRC does is to make sure on a day-to-day basis that these threats that might emerge are adequately identified and that the licensees are required to take appropriate action as is necessary to maintain safety. That is ultimately the NRC's mission. So there's – this is helpful, but I'm trying to understand, again, you know, there's been very, very serious hurricanes that have hit this country in recent years. And we now have had, you know, at least a close brush with a Category 5, absolutely devastating, one very, very close to the United States. So when safety reviews are being done today on these license applications, is there an assurance that the existing safety regulations are strong enough to stand up to Category 4 or 5 hurricane? Or, I mean, eyebrow raising doesn't make me feel better. Well, it's more than eyebrow raising. It's taking appropriate action in light of the hazards. Has that already happened? Well, let me point to the Fukushima example as an example of how the agency responds to threats. And granted, it's after the fact because the earthquake that precipitated it certainly had consequences in Japan. But the agency embarked upon a comprehensive program to improve its safety regime so as to not only take steps to, well, in that case, to take steps to make sure that licenses were taken, precautions to prevent an accident, and also to mitigate their consequences. And that's the agency's function. That's the agency's function on a day-to-day basis, irrespective of these snapshots it takes in connection with license renewal. And in the main, the agency accomplishes this through its ongoing safety oversight. It is true, Judge Garcia, as you suggested, that there is a comprehensive analysis of accident risk in the EIS itself. And that accident risk includes a lengthy chapter on external events. What we're talking about here are inputs to the analysis that the agency performed. And the question is of whether or not the agency should be entitled to deference in determining that these inputs didn't change the overall picture of the environment. Again, that's what NEPA is designed to have the agency capture. What is the overall picture of the environment that this particular action, the licensing of this particular agency action is going to have? And here the agency has- Is the SAMA analysis done by the plant itself when you're examining the risk of severe weather consequences? Yes, Your Honor. There are all kinds of other inputs into- Weather inputs. Risk of weather inputs. Maybe I'm misunderstanding your question. So the applicant prepares this- Am I saying- I assume that's how you say the acronym SAMA. Yeah. And that looks at how they're going to mitigate severe weather events based on entirely past events. I don't know how long in advance of the license that's prepared. I mean, it could be for the ones who did an original SAMA, that document could be 40 years old when they come to do their license renewal. I don't think they're quite that old, but let's say 20. Okay, 20 years old, and they come in 20 years old to predict out now for a 30-year window. If that's where you're getting sort of the analysis of how they're going to mitigate weather events, that seems grossly outdated. But you had said, no, no, we're looking up to date of at least license application. So that's where I'm trying to get the disconnect between their SAMA and then where- Are they providing you the information? Are you demanding it? Is there something that shows that the commission itself is going, thank you, that was very nice for 20 years ago. Where's your up-to-date analysis of how your plans- Well, that's predominantly accomplished through the day-to-day oversight of the plans themselves. The give and take between the licensee and the agency when storms emerge, present a threat. That's how the agency accomplishes safety. These SAMA analyses were originally designed to determine whether or not additional design alternatives or mitigation alternatives were appropriately implemented under NEPA, and they were a creature of NEPA itself. In this court's decision in NRDC versus NRC, the court upheld the agency's determination that it didn't have to do more than one of these analyses. And so those analyses exist dating back largely from the time of the first license renewal, so into the 2010s. But up-to-date information is provided to the agency, is gathered by the agency as part of its ongoing regulatory process, and that's how it determines in the main that it has reasonable assurance that plans should be able to continue to operate. And if the agency is concerned that some plant out there is not adequately prepared, it has tools in its regulatory portfolio to make licensees build a higher seawall, take action to mitigate the potential effects of flooding, and this is what I was trying to get to before. That's what happened post-Fukushima. The agency engaged in a comprehensive evaluation of the possible effects of a flooding or a sea-level rise event that might affect plants, and as a consequence, all of the evaluations of flooding were redone. That's the kind of oversight that the NRC performs. That's the kind of oversight that the NRC will perform if confronted with new and significant information about changes to the environment, increased storms, increased winds, things of that nature that might be associated with climate change. It's five years from now, as petitioners say, look what's happened in the last five years with storm frequency and intensity and the damages it caused and all those nice post-Fukushima seawalls. They're not going to be good enough when it happens, and they want to do this proactively, not reactively after an accident has happened. But look at these trends. Here's all these studies. This is going to get so much worse. What can they do? And the NRC hasn't done anything. What can they do? And this is not a stance-specific concern. Let's say it's the entire East Coast. What can be done to raise that before the agency? Again, there are a couple of avenues. I mentioned the petition for rulemaking before. Certainly, they can come in and I don't know that NEPA is necessarily the best avenue to do this, but rather to ask the agency to look at some safety regulations. And then on a plan-specific basis, licensee intervenors can come in and file a so-called citizen petition. It's not a specific concern. But there is a process under 10 CFR 2.206 to come in and specifically ask the agency to take action as against a particular license, to modify it, to suspend it, or even to revoke it because of an unresolved safety concern. That process is- But if the concern is based on climate change, is the agency's answer going to be, that's already covered by our generic EIS? Go away. Absolutely not, Your Honor. And let me be clear about this. This generic EIS has a role to play in the decision-making process for initial license issuance as well as each renewal. But in the main, it is a page-limited document designed to inform the public about risks and about impacts. But in the end, the agency's safety mission and the agency's safety review takes place outside of NEPA, and the 2.206 process is outside of NEPA. It's not about amending the environmental impact statement because, again, we acknowledge this. As I said, on the hypothetical new reactor that might be licensed today, we don't wait until 40 years from now to issue a new environmental impact statement and address climate change that way. We address safety issues as they emerge. And our finding of reasonable assurance in connection with the grant is a dynamic one. So what might be reasonable assurance today isn't necessarily reasonable assurance tomorrow, again, irrespective of whether the license has been renewed or not. And the agency needs to maintain its vigilance, and it does maintain its vigilance. And I would point to the Fukushima example as the best example I have of that. Have petitions for rulemaking regarding your Part 54, your safety regulations, been filed on the basis of climate change risks yet? Not to my knowledge, no. Sorry. I had a few questions. So on 267 of the JA, your brief reference is the statement that most of the external event risks, or at least it says winds, floods, and tornadoes, et cetera, are less significant than earthquakes and fires. Is that, and you cite that for the, I guess, the idea that climate change is going to make the wind stuff worse, not the earthquake stuff. Is that based on some, do you know, is there some other analysis of past weather events in the record that we can look at? That is the extent of the analysis in here, but that's based on the NRC's experience in A, analyzing safety issues, and B, issuing new licenses, and also its experience with the modeling. And, again, this is all part of a larger model that the agency prepared to determine. I understand. Okay. And then on recent license renewals, at least, I understand it's a long time between each plant coming and asking for renewal, but my understanding is over, say, it's an ongoing process. Sometime in the past five and ten years, many plants have been getting these renewals. Is that correct? Almost all the plants that were initially granted initial licenses throughout the 60s, 70s, 80s, got an initial license renewal. Now we're in the phase, because time progresses, that some are now obtaining a subsequent second renewal. So the NRC has 90-ish license renewals accomplished. I don't know the exact number, but something in that nature. And just as a general matter, when did those happen? In the past decade, the past two decades? The past 15 or so years, I think. Then there was a lot of, I just want to make sure I'm understanding. So you were discussing with Judge Millett, J-221, or you could call it A-222. The very first paragraph says, the NRC disagrees that we should consider climate change for postulated accidents. The last sentence is, the large margin can account for a variety of uncertainties. It doesn't say exactly all the things we were hypothesizing, but isn't that linking the NRC, linking the decision not to further study climate change, cause risks to the existence of the safety margin? I think that's a fair characterization. The margin is so enormous that the agency's understanding of where climate is, is not likely to cause any kind of significant change to its underlying conclusion that the risk, and this is the ultimate question in the NEPA case, that the risk of accidents is small. So if we put aside, I understand your high-level framing arguments, so don't just give me that answer to this question. But we've talked about climate change and just on aging. Assume that the commission largely proceeded as if we're going to deal with aging problems in our other programs, Part 54 and the ongoing safety. Assume I think there needs to be something to point to in the record to support that being a reasonable assumption. So we're assuming our other programs will work. What would you point to in the record to say that's a reasonable assumption with respect to the risks from aging components? The existence of the regulatory regime that the agency identified is proof positive that the impacts are likely to be small because the agency has confidence in its own aging management programs. I would further note, and this is what I said when I met you. Let me TFY the further thing is important, is that the New York One basically says you telling us you're on the job, we've got it, is not enough. Well, there's more to it than that. And let me provide a specific example. In New York One, we were largely talking about a circumstance where the agency hadn't performed an environmental impact statement at all, where there wasn't a 100-page analysis of potential accidents or of anything under review. And the court said, well, all I've got is this promise that you're on the case. I think that was the term that the court used. Yeah, that's why I prefaced this with what I did. I just want to directly… We have this regulatory regime in place. And an important fact here that in many ways I think really addresses, as a factual matter, the aging management issue is that the modeling that the agency performed included a so-called random failure rate of equipment that accounts for failures of equipment due to aging or at least is a suitable proxy for that such that the contentions that the petitioners have raised largely go by the wayside and fall well within the margin we're talking about here. Because although we didn't need to do this because of the robustness of the regulatory regime, we still factored in or we still factored into the analysis the potential for equipment failures, including equipment failures due to aging. Thank you. Thank you very much, Jonathan. Thank you. Mr. Rund? Good morning. May it please the court. Jonathan Rund for the interveners. I just want to start out by noting the seven-county decision makes clear that the scope and the depth of EIS or Matters Against Substantial Deference heard the petitioners try to say that it's really only about indirect impacts and cumulative impacts. And I think it's pretty clear if you look at Part 2A of the Supreme Court decision, it covers a lot more. I don't want to spend a lot of time on that. I think it just begs the question, though. I think you would not disagree that we can't divert to something that doesn't consider all relevant factors, issues, in a reasoned way. Precisely. And I think that 100. That's really what this case is about. Yeah. And if I could turn to that. I mean, the 100-page accident analysis, I think it's well within the zone of reasonableness. I mean, I did not read the opinion of the seven counties as they count the pages if those pages aren't talking about the right issues. Precisely. It's awkward looking here and not projecting forward because that's out of scope. I just don't know what to do with that. That's out of scope? How can a license renewal for 25 or 30 years into the future say that what's going to happen to weather, and there's lots of reason to believe it's going to get worse, is out of scope? I think it's best to read those out of scope comments and then the comment response to that is essentially meaning the agency is exercising its judgment about really how much margin and what's built into the analysis. If you look at... That's not what out of scope means. It's just not what it means. Right? That's not... I just don't know how you can say this, but it means... What is out of scope? As I said there... If we look at JA-221, one of the sentences that talks about it being out of scope goes on to discuss the margin issue and what's been done on a site-specific basis for severe accidents. If you look at what's actually in the analysis... The agency disagrees that the impacts of future climate change and mitigation should be considered for postulated accidents. The impacts of future changing phenomena on nuclear power plant hypothesized accidents are outside the scope of this GEIS and rulemaking. I think what they're saying is two things. One thing, if you continue forward, that the NRC considered updated information about site-specific external events. If you turn to appendix E... It's past. It's all... Updated as in, like, before the filing of this license application. Do you have any reason to think updated means a projection for the next 30 years? Well, absolutely. So, first of all, the plans are designed... The decision doesn't say when we said existing and updated information, we actually engaged in the very analysis of impacts of future climate change we just discussed. What evidence is there that they looked forward into the period when the license renewal would be operating? Well, I think it's important to have the context for how the NRC regulates these issues. The plans are designed, as the petitioner said, to look at information that's in the historical record. But the part that got left out is historical margin... Sorry, the historical record accounting for unknowns, accounting for margins. So there's cushion that's built in to how the plans were designed. And since the plans were originally designed... Cushion begs the question of how much cushion and what informs the size of the cushion. And if the cushion was not considered with any analysis of future risk during the period of this license renewal, it doesn't do much good to say, if everything stays the same as it did for the last 40 years, we have so much cushion. Nobody's assuming that things stay the same or static. The analysis that's in Appendix E is relying on the latest severe accident mitigation alternative analyses that have been done for license renewals up through the past couple of years. What are they based on? Is it past weather events? It's up to each licensee to go forward and present that information. They're basing it on their most sophisticated probabilistic analysis that they used for the plan. What are the inputs? Is it past weather events up to the time of whatever reasonable time before I actually file it? The latest information up until the application. Is it actual information of events that have occurred, or is it the latest information about prognosticated future climate change? Those are two different things. Which is it? I don't think the record spells it out in that detail. I think there's plenty that says you look at the past trend, the past trend of climate change. And that's what the companies are doing. And there's nothing other than this line about future climate change being out of scope that tells me that anyone, that the agency requires. Maybe you can tell me a particular plant that has actually done this. But on the record, the requirements that are on the record now are not about prognosticating climate change risk for the next 30 years and its impact. And we are seeing storms that will exceed any margin. I think it's important, another thing to keep in mind, is that the plants are updating to deal with climate change. We talk about, for example, in our brief, after the Fukushima accident, that the NRC requested information from licensees on updated flooding analysis to do that forward looking. We talk about one of those examples, the Cherokee Point plant, page 30 to 31, footnote 67 and 34 of our plant, where the NRC, at the NRC direction, the licensee went ahead and did that projection looking at sea level rise up to 20 years. And as part of that, they looked out to 100 years, even though it's well beyond the license life. And the licensee was required to update their licensing basis to make sure that they can account for that. And I think the fact that that is done. One, Cherokee Point, are all, do the rules require after Fukushima? Every licensee. Every licensee. Every licensee got. A three-year forward projection on protection against hurricanes or the extraordinary amount of sort of even just water that is coming in? Every. I'm sorry. You're jumping in. So every licensee got the requirement to look at what their unique hazards are. We have some plants that are on rivers, some that are on lakes, others that are on the coast. And every licensee was required to look at what was relevant to them, some of the more seismic risks, some of the flooding. And the NRC provided extensive oversight of that, and they've since institutionalized that process. It's just too vague for my question is, did, and this may be their simple answer, did NRC say that in deciding whether you are now safe against a Fukushima-sized tidal wave or that type of earthquake or similar hurricane force, storm rise, project forward 100 years? That's to the point you tell me to? I don't know that everybody was required to look at 100 years. Did nothing require them to look forward? Did anything require them to look forward 50 years? There was a requirement to look at what the relevant risk was for that plant. It obviously doesn't make sense to worry about sea level rise if you're on this That's the question of what the relevant risk is. Did the relevant risk include forward looking? Yes. Fukushima's in the past. The next one's going to be worse. Did anyone, okay, what in the regulation or what can you point me to that says they were required to look forward to increased risk beyond what we saw in Fukushima? Or was it just to protect against what happened in Fukushima? No. The NRC went well beyond what was just fighting the last battle essentially and looked at what specific things would be relevant to different plants based on their unique environment. And I can't say that there's a- What do they require those that are on a coast to do? The only one I'm familiar with, because we cited it in our brief, was the Cherokee Point plant where they did do a full flooding re-evaluation. And based on that analysis, which gets a lot of NRC oversight and review, they went ahead and looked at the sea level rise projections. NRC verified that modeling does inspection. NRC has since realized that this is not going to be a one and done situation post-Fukushima. We want to make sure- They want to make sure that we are on top of these issues, we in the industry, on an ongoing basis. And they institutionalized an ongoing program to look at ongoing hazards. That's discussed- I think that's what's alluded to in terms of the general NRC oversight. What is an ongoing- You just said ongoing hazards. What does it mean to say ongoing? Does that mean current level? I may have misspoke. I meant it's an ongoing process to look at the latest hazards information. There's a new study that comes out from NOAA on hurricanes. NRC, through its interagency process, is plugged into that. They're plugged into the academic community to make sure that they're looking at it and they can figure out which plants are affected by those hazards and which aren't. Similarly with seismic type issues. So it's an ongoing process to make sure that we're not waiting until license rule to address those issues. I think that- NRC is so on top of this and is already doing this, making sure your plants are protected against forecasted harms, recently forecasted harms. Why was it so out of scope not to have it addressed in the generic EIS? They've got the capability. They're doing it. If it's part of the risk that they're enforcing, why is it not in the generic EIS? I'd submit that the NRC made the technical judgment that it is bounded. It looked at the increased- Sorry, it is bounded? I don't know what that means. So the context of which the severe technical 100-page analysis, but the NRC looked at the latest hazard information that's available based on flooding and seismic issues and basically determined, if you look in the JA 87 to 89 or the more detailed document at 256 to 257, it looked at the latest external events. External event is a technical term that covers a whole lot of things, including the types of risks we're talking about from climate risk. And the NRC actually said, you know what? Since we looked at this issue in detail in 1996, actually those risks could be higher. They can be four to five times higher. But the environmental risk isn't just the probability of an event happening, such as a flood. Environmental risk is what happens off-site in terms of the impacts to the environment and the impacts to the public. And based on other new information, the NRC found there would be 120 times reduction in risk. And what the NRC, I think, is saying on page, I think it's fair reading of what they're saying in response to the climate change comments on page 221, is that when you have 120 times reduction in risk for things that have to do with source term, what material might get released to the environment, and you have a four to five times increase from the potential of external hazards.   It's ridiculous that the NRC is looking at swamps and cancels out any potential increase that you have from increased external hazards, including anything that might be related to climate change. And so when the NRC is saying the large margin can account for a variety of incertainties, including imperfectly quantified factors in the risk analysis. And they're doing that in response to comments on the climate change issue. I think they're exercising the type of technical judgment and expert opinion. And so much of it seems to be backwards looking. But anyhow, I think we're over time. Do you want to wrap up in one sentence? Yes, just briefly. I think make the point that I think NRC has done a very comprehensive analysis and they certainly responded to the issues and pointed back to the technical analysis that addressed the precise issues in terms of what external events are and they quantify those in a very sophisticated manner. I think that's precisely the type of technical judgment that the Supreme Court is entitled to. Thank you. Ms. Perrin, we'll give you a few minutes. Thank you. I'd like to point the court's attention to Baltimore Gas and Electric versus NRC. That's cited by everybody. In that case, and I think it's cited in seven counties, that involved the generic impact statement. And the Supreme Court said, NRC, you can do this, but you have to do it right. You have to comply with NEPA because the point of a generic impact statement is down the road, this thing is going to be applied in individual licensing proceedings. Those findings are going to be binding and it's going to be tough on the public to challenge that. So do it right now. Do it correctly now. And what we have here is an EIS that purports to deal with accident risk for the foreseeable future. Yes. You commented on the draft EIS, right? Your client? Yes. What if any comment that you made in that process was not responded to? Were there any comments that you made that were not, that the agency failed to respond to? No, it was the response that this is out of scope. That response is what we're here challenging. This is out of scope. Can they explain further why it was out of scope? Yeah, they said. It's a brass tacks. Yeah. Not playing poker. Sure. There's a rule of prejudicial error. Yes. And then there's language in seven county about this is a procedural statute that's not about outcomes. And if ultimately the agency might have used the words out of scope, but in doing so, and in explaining that, and in responding to your and other comments, they were making the point that they felt that other avenues, other safety regulations, other procedures, other things that were done were going to address this issue. Then tell me how your arms. Because they didn't support. They didn't support what they said. They said, essentially, they said, we did a safety analysis with these big margins and that pretty much you could put the kitchen sink in there and it's not going to affect anything. And that to us was not NEPA compliance because they didn't support it. There is nothing in that EIS where they gave us, what's the data? What's the analysis to say this? There's nothing there. So a response to comments is, yeah, there's a response, but it's totally inadequate. And, you know, we see in the NRC's brief after they tell us, we're the world's experts on accident risk. And then in their brief, they say, we don't know how to talk about climate change. We need to see that. NEPA violation for an agency to respond to something without adequate support. Correct.  And I just think. Case for that is what? Is the administrative procedure act, the NEPA requiring a rule of reason a response to comment has to have. I mean, what you're saying sounds to me like. Like we're judging the substance of their response and whether their response was sound and adequately supported in an area of active and scientific judgment and all of those things where we're been told that deference is supposed to be at its height. But if there's not, if there's nothing there, if the NRC, it's clear that the NRC isn't looking at climate change, they don't have climate change regulations. They don't even have a climate change policy. They say who wrote the response to comments. This is a big margin of error and lots of things could fit in there. And we did comment. You're putting an awful lot of things because they said in the draft, we have a big margin of error. We said, you're trying to fit an awful lot of things in this margin of  And there certainly is no indication that they explicitly looked at climate change. And that's a huge issue here. And it's going to reverberate. It's down decades from now in these individual cases where the failure to deal with this issue is going to bind in individual cases. And, you know, it's one thing we have to accept that the generic EIS, if they comply with NEPA, if the NRC makes supported, and I know there's discretion here, but there's got to be some findings and some data that some, a technical expert could evaluate and say, oh, they did look at climate change. They did look at these long-term aging effects. You can't find it, but down the road, we're going to be bound by this finding. You can't use the individual licensing proceedings to cure the defective license renewal, GEIS. That is Baltimore Gas and Electric. And another thing that Mr. Aberbeck said, you know, we have this separate Atomic Energy Act review. And then there's NEPA over here, which he referred to as a snapshot. If you go back to Calvert-Cliffs, that's an old case. One of the first NEPA cases decided by this court, NEPA goes along with the Atomic Energy Act. It has to be included in the decision-making process. And what we see here is that the NRC really did treat it like a snapshot that you could rip up and, you know, later on too bad for the public when we come in and individual cases, and we're told we have an empty husk of a license renewal GEIS, but it binds you. We're looking for fundamental compliance with the National Environmental Policy Act and the Administrative Procedure Act. So I understand Baltimore Gas and Electric, you agreed that if there's new and significant information, there's the new and significant information exception, I guess, and the waiver process. So we would also, you don't disagree that those exist, you just think they're inadequate. We think that if the NRC did comply with NEPA in doing the generic EIS, these are reasonable procedures under NEPA and the APA, but the generic EIS has to comply with NEPA. You can't use the fact that we have procedures down the road to say, oh, well, you know, try to get them to deal with this later on. We're here because the NRC decided to do a generic EIS. We didn't decide that. And we have the right to demand compliance with NEPA now. Just one last little factual question. Has anyone, NOAA studies this very closely, has anyone anywhere put a number on how much worse climate change is likely to make storms? I'm afraid I don't know that, Judge Garcia. I just know that what the, you know, the accepted wisdom is, storms are going to get more frequent and more intense. And every time they look, it seems like it's going faster and more intensely than they thought last year. Thank you very much. Thank you. All council, the case is submitted.
judges: Millett; Wilkins; Garcia